UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Hanah Bates; Michael S. Bridges;  Ann Marie Kuter; Kelley Liott; Lynda Mills, as parent and natural guardian of S. M., a minor; Jennifer Rock; and Carolyn Sippel, individually and on behalf of all others similarly situated,<br><br>                      Plaintiffs,<br><br>    v.<br><br>The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.); Angus Fire; The Ansul Company; Buckeye Fire Protection Company; Chemguard; and National Foam,<br><br>                    Defendants. | Case No.<br><br><br>**COMPLAINT - CLASS ACTION**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Hanah Bates, Michael S. Bridges, Ann Marie Kuter, Kelley Liott, Lynda Mills, as parent and natural guardian of S. M., a minor, Jennifer Rock, and Carolyn Sippel (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, as and for their complaint against defendants, The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), Angus Fire, The Ansul Company, Buckeye Fire Protection Company, Chemguard, and National Foam (collectively, "Defendants"), allege as follows:

## INTRODUCTION

1.     Plaintiffs bring this action against Defendants for medical monitoring and property damage because their drinking water has been contaminated by chemicals Defendants manufactured and sold without warning users of the toxic effects these chemicals would cause if they contaminate the environment, and without regard to the innocent bystander Plaintiffs who predictably would be exposed to these chemicals once they infiltrated their drinking water.

2.     For years—even decades—the Defendants manufactured and sold Aqueous Film Forming Foam ("AFFF"), a firefighting suppressant agent, to the U.S. Navy for use on ships and at military bases, including the former Willow Grove Naval Air Station Joint Reserve Base in Horsham Township, Pennsylvania (the "Willow Grove Base"), and the former Naval Air Warfare Center in Warminster Township, Pennsylvania (the "Warminster Base").  (The Willow Grove Base and the Warminster Base are collectively referred to as the "Bases.")

3.     Residents in the area near the Bases obtain their drinking water predominantly from groundwater pumped by either municipal or private wells.  For decades, residents near the Bases, and employees on the Bases, have been drinking water laced with dangerous chemicals, namely, perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").   When consumed, PFOS and PFOA can cause numerous and serious health issues.  Additionally, the presence of PFOS and PFOA in drinking water can result in devaluation of property.

4.     The Defendants manufactured AFFF that contained "fluorocarbon surfactants," believed to include PFOS, PFOA, and/or certain other perfluorinated compounds ("PFCs") that degrade into PFOS or PFOA.  (PFOS, PFOA and the PFCs that degrade into PFOS or PFOA are hereinafter referred to as "Toxic Surfactants.")  The Defendants' precise formulas for their AFFF during the relevant period have not been made public.

5.     As the manufacturers of AFFF, the Defendants knew or should have known that the inclusion of Toxic Surfactants in AFFF presented an unreasonable risk to human health and the environment.

6.     Nonetheless, Defendants marketed and sold their products with the full knowledge that large quantities of Toxic Surfactant-laden AFFF would be used in training

2

exercises and in emergency situations in such a manner that the dangerous chemicals would be introduced, in large quantities, into the environment.

7.     The residents in the communities that surround the Bases, as well as many civilians and military personnel who spent significant time on the Bases, have been exposed for years, if not decades, to PFOS and PFOA at concentrations well above a safe drinking level. These innocent bystanders had no way to know that they were consuming water contaminated with PFOS and PFOA until the contamination was disclosed to them by state and federal officials.

8.     The Plaintiffs bring this suit on behalf of themselves and all those similarly situated to recover damages from the corporations who blindly reaped profits at the cost of the Plaintiffs' health and wellbeing.

## PARTIES

**Plaintiffs**

9.     Plaintiff Hanah Bates is a citizen of the Commonwealth of Pennsylvania, with an address at 41 Shannon Road, North Wales, PA 19454.  From 2005 to 2011, Ms. Bates resided at 1700 Street Road, Warrington, PA 18976 and obtained her drinking water from the Warrington Township Water and Sewer Department.  Ms. Bates also worked at the Willow Grove Base as a civilian employee and drank water that was supplied from wells on the Base.

10.     Plaintiff Michael S. Bridges is a citizen of the Commonwealth of Pennsylvania, who, from 2009 to the present, has resided at 329 Hawthorne Street, Warminster, PA 18974.  Mr. Bridges obtains his drinking water from a private well located on his property.  From 2006 to 2009, Mr. Bridges resided at 577 Skyhawk Drive, Warminster, PA 18974, where he obtained his water from the Warminster Municipal Authority.  From 1997 to 2000, Mr. Bridges was stationed

at the Willow Grove Base as a member of the military and drank water that was supplied from wells on the Base.

11.     Plaintiff Ann Marie Kuter is a citizen of the Commonwealth of Pennsylvania, who, from 2007 to the present, has resided at 562 Taylor Avenue, Warrington, PA 18976. Ms. Kuter obtains her drinking water from the Warrington Township Water and Sewer Department.

12.     Plaintiff Kelley Liott is a citizen of the Commonwealth of Pennsylvania, who, from 2008 to the present, has resided at 315 Evergreen Road, Horsham, PA 19044. Ms. Liott obtains her drinking water from a private well located on her property.

13.     Plaintiff Lynda Mills, as parent and natural guardian of S. M., a minor, is a citizen of the Commonwealth of Pennsylvania. S. M. has resided at 103 Sourwood Drive, Hatboro, PA 19040 from 2008 to the present. S. M. obtains his drinking water from the Horsham Water and Sewer Authority.

14.     Plaintiff Jennifer Rock is a citizen of the Commonwealth of Pennsylvania, who, from 2001 to the present, has resided at 303 Edgely Avenue, Horsham, PA 19044. Ms. Rock obtains her drinking water from the Horsham Water and Sewer Authority.

15.     Plaintiff Carolyn Sippel is a citizen of the Commonwealth of Pennsylvania, who, from 2003 to the present, has resided at 514 Overlook Drive, Warminster, PA 18974. Ms. Sippel obtains her drinking water from the Warminster Municipal Authority.

**Defendants**

16.     Defendant The 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

4

17.     Through at least 2002, 3M manufactured PFOS for AFFF and it manufactured AFFF that contained fluorocarbon surfactants.

18.     Defendant Angus Fire ("Angus") is part of Angus International, and has corporate headquarters in Bentham, United Kingdom.  Angus Fire maintains a place of business in the United States at 141 Junny Road, Angier, NC 27501.

19.     At all times relevant, Angus manufactured fire suppression products, including AFFF that contained fluorocarbon surfactants.

20.     Defendant The Ansul Company (hereinafter "Ansul") is a Wisconsin corporation, having a principal place of business at One Stanton Street, Marinette, WI 54143.

21.     At all times relevant, Ansul manufactured fire suppression products, including AFFF that contained fluorocarbon surfactants.

22.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation, with its principal place of business at 110 Kings Road, Kings Mountain, NC  28086.

23.     At all times relevant, Buckeye manufactured fire suppression products, including AFFF that contained fluorocarbon surfactants.

24.     Chemguard is a Wisconsin corporation, having a principal place of business at One Stanton Street, Marinette, WI 54143.

25.     At all times relevant, Chemguard manufactured fire suppression products, including AFFF that contained fluorocarbon surfactants.

26.     National Foam, Inc. (a/k/a Chubb National Foam) (National Foam, Inc. and Chubb National Foam are collectively referred to as "National Foam") is a Pennsylvania corporation, having a principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382.

5

27.    At all times relevant, National Foam manufactured fire suppression products, including AFFF that contained fluorocarbon surfactants.

## JURISDICTION AND VENUE

28.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff classes are citizens of states different from at least some of Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

29.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events or omissions by Defendants giving rise to the claims asserted herein occurred in this District, have caused harm to Class Members residing in this District, and Plaintiffs Hanah Bates, Michael S. Bridges, Ann Marie Kuter, Kelley Liott, Lynda Mills, as parent and natural guardian of S. M., a minor, Jennifer Rock, and Carolyn Sippel reside in this District.

## GENERAL FACTUAL ALLEGATIONS

**Background Regarding PFOS and PFOA**

30.    PFCs are manmade chemicals that do not exist in nature.

31.    There are numerous chemicals in the PFC family, but the two most prevalent PFCs are PFOS and PFOA.

32.    PFCs, including PFOS and PFOA, have been widely used in industry and in commercial products due to their quality to repel water, oil, and grease.

33.    Companies used PFOS and PFOA to make, among other things, carpets, clothing, fabrics for furniture, paper packaging for food and other materials such as cookware that are resistant to water, grease or stains.

6

34.     Companies also used PFOS and other Toxic Surfactants specifically to make AFFF.

35.     PFOS and PFOA have unique properties that cause them to be classified as persistent, bioaccumulative, and toxic.

36.     First, PFOS and PFOA are persistent.  Due to the strength of multiple carbon-fluorine bonds, PFOS and PFOA break down very slowly in the environment.

37.     PFOS and PFOA are thermally, chemically, and biologically stable and resistant to biodegradation, atmospheric photooxidation, direct photolysis, and hydrolysis.

38.     PFOS and PFOA can persist in the environment for decades.

39.     PFOS and PFOA are also water soluble, making them mobile in groundwater and the environment.

40.     Typical municipal water treatment plants do not filter PFOS and PFOA from contaminated water due to the chemicals' physical properties.

41.     Similarly, chlorine and other disinfectants that are typically added to municipal drinking water systems do not remove PFOS or PFOA from contaminated water.

42.     Second, PFOS and PFOA are bioaccumulative.

43.     Toxicology studies show that PFOS and PFOA are readily absorbed after oral exposure and accumulate primarily in the serum, kidney, and liver.

44.     PFOS and PFOA have a half-life within the human body of 2 to 9 years.

45.     PFOS and PFOA can bioaccumulate up the food chain; can cross the placenta from mother to fetus; and can be passed to infants through breast milk.

46.     Third, PFOS and PFOA are toxic.

7

47.     There are a number of health risks associated with exposure to PFOS and PFOA, and these risks are present even when PFOS and PFOA are ingested at seemingly low levels (less than 1 part per billion).

48.     PFOS and PFOA exposure is associated with increased risk in humans of testicular cancer and kidney cancer, disorders such as thyroid disease, high cholesterol, ulcerative colitis, and pregnancy-induced hypertension, as well as other conditions.

49.     Epidemiological studies are ongoing and the full harm of PFOA and PFOS exposure is not yet fully understood.

50.     For example, epidemiological studies of PFOS and PFOA exposure in animals have shown the ability to cause other cancers.  Studies in lab animals have found that exposure to PFOS and PFOA also increases the risk of tumors in the liver, bladder, thyroid, and mammary glands.

51.     EPA has also advised that exposure to PFOS and PFOA may result in developmental effects to fetuses during pregnancy or to breastfed infants.

52.     Injuries, however, are not sudden; rather, they can arise months or years after exposure to PFOS and/or PFOA.

**PFCs in AFFF**

53.     AFFF that contained PFCs was developed in the 1960s as an alternative to existing firefighting foam.

54.     In 1969, the Department of the Navy issued Military Specification MIL-F-24385 for AFFF.

55.     A Military Specification is a document that describes the physical and/or operational characteristics that a product must meet before purchase by the United States military.

56.     That is, in order for an AFFF manufacturer to sell its AFFF to the Navy, it was required to meet MIL-F-24385.

57.     MIL-F-24385 covered "the requirements for aqueous film-forming foam (AFFF) liquid concentrate fire extinguishing agents consisting of fluorocarbon surfactants and other compounds" as required to meet certain performance standards that were also set forth in MIL-F-24385.

58.     If the Navy found that a manufacturer's product satisfied MIL-F-24385 performance expectations, the Navy placed the product on the Department of Defense Qualified Product Listing.

59.     3M, Angus, Ansul, Buckeye, Chemguard, and National Foam each manufactured AFFF that was included on the Department of Defense Qualified Product Listing for MIL-F-24385.

60.     Although MIL-F-24385 required the use of a "fluorocarbon surfactant," it did not specify a particular chemical, such as PFOS or another Toxic Surfactant.

61.     Upon information and belief, 3M, Angus, Ansul, Buckeye, Chemguard, and National Foam each chose a Toxic Surfactant to manufacture their MIL-F-24385-compliant AFFF.

**AFFF Use at the Willow Grove and Warminster Bases**

62.     At any given time during their operation, the Bases housed thousands of gallons of AFFF concentrate manufactured by Defendants, stored in buckets, drums, tankers and sprinkler systems.

63.     U.S. Navy, Air National Guard, Marines, and Air Force (collectively referred to as "Military") personnel, as well as civilian firefighters, conducted training exercises at the Willow Grove and Warminster Bases.

64.     In part, the Military and civilian firefighters engaged in firefighting and explosion training that required the use of AFFF.

65.     For decades, firefighting training activities took place at the two military bases.

66.     Each site also possessed and maintained aircraft hangars protected by ceiling units holding hundreds of gallons of AFFF.

67.     The use of AFFF for training purposes included suppressing fires and explosions on the ground, as well as coating runways in anticipation of difficult landings, all of which resulted in acres of foam-covered soil and blanketed wreckages.

68.     Upon information and belief, accidental discharges occasionally occurred within the aircraft hangars resulting in the discharge of hundreds of gallons of AFFF.  The personnel at the Bases cleaned the hangars by washing the foam down drains.

69.     Upon information and belief, instructions and warning labels affixed to AFFF by the Defendants did not adequately describe the scope of danger associated with use and disposal of AFFF.

70.     Upon information and belief, at no time prior to May 2000 did the Defendants warn the users of the AFFF of the health risks associated with use, disposal and bioaccumulation of AFFF components.

71.     Upon information and belief, at no time prior to May 2000 did the Defendants warn the users of the AFFF of the health risks of introducing AFFF into the environment.

72.     Upon information and belief, at no time during the relevant period did the Defendants warn users of the AFFF that ingredients in the AFFF were persistent, bioaccumulative and toxic, or that, once introduced into the environment, its chemical components would readily mix with ground and surface water and migrate off the Bases, contaminating the surrounding communities.

73.     In 2002, 3M ceased production of AFFF manufactured with PFOS due to health and environmental concerns.

74.     Upon information and belief, 3M and the other defendants had known of these dangers for years.

75.     Even though 3M, who was the predominant manufacturer of PFOS-based AFFF, ceased production of PFOS-based AFFF in 2002, neither 3M nor any other Defendant that used a Toxic Surfactant recalled its dangerous products.

76.     According to one study, as of 2011, there were still 1,972,000 gallons of PFOS-based AFFF stockpiled in the United States.

77.     Consequently, upon information and belief, Military personnel and civilians at the Willow Grove Base continued to use PFOS-laden AFFF for trainings and emergencies until the base closed in 2011.

**Regulatory Action for Safe Drinking Water**

78.     The EPA has a process to monitor and, in some cases, regulate emerging contaminants of concern.  These processes include, among others, Contaminant Candidate Lists, the Unregulated Contaminant Monitoring Rule, and Health Advisories.

79.     A "Contaminant Candidate List" is a list of contaminants that are currently not subject to any proposed or promulgated national primary drinking water regulations, are known or anticipated to occur in public water systems, and may require regulation under the Safe Drinking Water Act.   The Safe Drinking Water Act requires that EPA to publish the Contaminant Candidate List every five years.

80.     In 2009, the EPA's Third Contaminant Candidate List included PFOS and PFOA.

81.     In 2009, the EPA also established a Provisional Health Advisory ("PHA") for PFOS and for PFOA.

82.     The EPA develops PHAs to provide information in response to an urgent or rapidly developing situation.  PHAs reflect reasonable, health-based hazard concentrations above which action should be taken to reduce exposure to the identified drinking water contaminants.

83.     The 2009 PHA for PFOS was 200 ppt and the PHA for PFOA was 400 ppt.  The PHAs state that the discovery of PFOA and/or PFOS in water above the advisory levels should result in the discontinued use of the water for drinking and cooking.

84.     The Unregulated Contaminant Monitoring Rule ("UCMR") is used by the EPA as a monitoring vehicle for chemicals listed on the contaminant candidate list.  The UCMR is authorized pursuant to the Safe Drinking Water Act, and requires certain public water systems to add and monitor UCMR-identified chemicals to routine water safety testing.

12

85.    EPA's selection of contaminants for a particular UCMR cycle is largely based on a review of the Contaminant Candidate List.

86.    In 2012, the EPA included PFOS and PFOA in its Third Unregulated Contaminant Monitoring Rule ("UCMR3").  By placing PFOS and PFOA on this list, the EPA required certain water providers across the country, including those in Horsham, Warminster and Warrington, to test their water for the presence of PFOS and PFOA.

87.    In 2014, the Horsham Water and Sewer Authority tested its municipal wells in accordance with UCMR3.  The testing showed that two of its wells were contaminated with PFOS above the PHA of 200 ppt.  The Horsham Water and Sewer Authority immediately shut off those wells.

88.    Subsequently, the Horsham Water and Sewer Authority re-tested all of its active wells using a more sensitive test.  When the Horsham Water and Sewer Authority re-tested its wells, each of its wells showed contamination from PFOS and/or PFOA.  Horsham eventually shut down five of its wells due to PFOS and/or PFOA contamination.

89.    Between November 2013 and June 2014, the Warminster Municipal Authority also tested its wells in compliance with UCMR3.  The testing showed PFOS levels of 40 ppt to 1090 ppt and PFOA levels of 20 ppt to 890 ppt.  The Warminster Municipal Authority closed six of its wells due to PFOS and/or PFOA contamination.

90.    Warrington Township also participated in UCMR3 during 2014 and 2015.  The testing showed PFOS levels as high as 1600 ppt and PFOA levels up to 270 ppt.  Warrington Township initially closed three of its wells, and eventually closed five of its wells due to PFOS and/or PFOA contamination.

91.     The widespread discovery of contaminated municipal drinking water wells led the EPA to call for testing of private drinking water wells within the area.

92.     Since the summer of 2014, the EPA has tested scores of wells in the vicinity of the Bases.  The EPA began reporting the results of the tests during the fall of 2014, at which point the PHA remained at 200 ppt for PFOS and 400 ppt for PFOA.  Even at that time, several private wells tested above the PHAs.

93.     The area that contains the impacted wells consists of a roughly rectangular area bounded on the northwest by the intersection of Folly Road and County Line Road; on the northeast by the intersection of Almshouse Road and Walton Road, on the southeast by the intersection of Street Road and Willopenn Drive, and on the southwest by the intersection of Norristown Road and Welsh Road, as set forth in the map attached hereto as Exhibit A (hereinafter, the "Affected Area").

94.     In May 2016, the EPA revised its PHAs when it issued "final" Health Advisories for PFOS and PFOA.

95.     The final Health Advisory for PFOS is 70 ppt and the final Health Advisory for PFOA is also 70 ppt.  In addition, where both PFOS and PFOA are present, the combined Health Advisory limit is also 70 ppt.

96.     Other agencies have suggested limiting exposure to even lower levels of PFOS and/or PFOA.  A panel of scientists studying the health impacts from PFOA-contaminated drinking water in and around Parkersburg, West Virginia found negative health outcomes associated with exposure to drinking water containing PFOA at 50 ppt.  Certain states have also promulgated advisory exposure levels lower than the EPA's advisory level, including the State of

New Jersey, which promulgated an advisory exposure level for PFOA of 14 ppt and the State of Vermont, which set its enforcement standard at 20 ppt for PFOA and 30 ppt for PFOS.

97.    As a result of the EPA's issuing its final Health Advisories for PFOS and PFOA, numerous residents, including the named Plaintiffs with private wells, learned that their water was contaminated with dangerous levels of PFOS and/or PFOA.

98.    The Navy has offered assistance to several impacted residents, but their effort is too little, too late.

99.    The high concentration levels of PFOS and PFOA found in the water near the Bases has been determined to be from the use of AFFF and, therefore, is directly linked to Defendants' manufacture of AFFF.

100.    As set forth herein, Defendants knowingly manufactured, sold, and distributed a dangerous and defective product, failed to provide proper warnings to protect bystanders, such as the Plaintiffs, and failed to recall their products when they took them off the market.

101.    Since 2014, many drinking water wells tested within the Affected Area have shown concentrations of PFOS and PFOA.

102.    Multiple studies suggest that even small concentrations of PFCs are harmful to humans.

103.    All residents in the areas surrounding the Bases should have access to water free of PFOS and PFOA.

104.    There is no indication of when the drinking water in and around the Affected Areas will be free of PFOS and PFOA contamination.

105.    Indeed, following the removal of several large-drawing municipal wells from the aquifer, recent tests on some private wells have shown increased levels of PFOS.

106.    Further, there is no promise or plan to monitor the health of former and current residents or former base employees who obtained their drinking water from municipal wells in Warminster, Horsham and Warrington, Pennsylvania or wells on the Bases.

107.    There is no promise or plan to monitor the health of former and current residents or former base employees who obtain or obtained their drinking water from private wells in the Affected Area.

108.    Finally, as a consequence of the contaminated water within the municipal water systems and private wells, many residents have suffered a loss of use and enjoyment of their properties, and their contaminated properties are less attractive to prospective buyers.

## CLASS ACTION ALLEGATIONS

109.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

110.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all other persons similarly situated as members of the proposed Subclasses:

### Municipal Water Subclass
Current property owners who have resided in their current residence for at least one year since 1970 and who obtain their drinking water from either: Horsham Water and Sewer Authority, Warminster Municipal Authority, or Warrington Township Water and Sewer Department.

### Private Well Subclass
Current property owners who have resided within the Affected Area for at least one year since 1970 and who obtain their drinking water from a private well.

### Non-Property Owner Subclass
Non-property owners who obtained their drinking water for at least a one-year period from 1970 to the present from the Horsham Water and Sewer Authority, Warminster Municipal Authority, or Warrington Township Water and Sewer Department; from a well located on the Bases; or from a private well within the Affected Area.

**The Base Water Subclass**

Military and civilian workers at the Bases, who are not members of any other Subclass, who obtained their work-day drinking water for at least a one-year period from 1970 to the present, from wells located on the Willow Grove Base and/or the Warminster Base.

111.    Excluded from the classes set forth above are: (a) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) any class counsel or their immediate family members; (d) any State or any of its agencies; (e) the municipalities of Warminster, Horsham and Warrington, Pennsylvania; and (f) any individual who otherwise would be included under one or more of the class descriptions above, but who is a party in a lawsuit for personal injury for a PFOS/PFOA-related illness related to exposure to contaminated municipal or private well water.

112.    Collectively, the Municipal Water Subclass, the Private Well Subclass, the Non-Property Owner Subclass, and the Base Water Subclass are referred to as the "Subclasses."

113.    The Subclasses and this action satisfy the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

**Numerosity**

114.    The members of the Subclasses are so numerous that joinder of all members is impracticable.  The population in the Affected Area is estimated to include 70,000 current residents.  Plaintiffs believe that there are tens of thousands of members of the Subclasses that have been exposed to PFCs from Defendants' AFFF as described herein.  Subclass members can be easily identified from public records, such as: property tax records, municipal water records, and employment records.  All such Subclass members may be notified of the pendency of this action by mail or via other public forums.

## Typicality

115.    Plaintiffs' claims are typical of the claims of the members of the Subclasses inasmuch as all members of the Subclasses are similarly affected by Defendants' misconduct resulting in injury to all members of the Subclasses.

## Adequate Representation

116.    Plaintiffs will fairly and adequately protect the interests of members of the Subclasses and have retained counsel competent and experienced in class action and environmental litigation.

117.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Subclasses and have the financial resources to do so.

118.    Neither Plaintiffs nor their counsel has interests adverse to any of the Subclasses.

## Predominance of Common Questions

119.    Plaintiffs bring this action under Rule 23(b)(3) because numerous questions of law and fact common to class members predominate over any question affecting only individual members.  The answers to these common questions will advance resolution of the litigation as to all class members.  These common legal and factual issues include:

a.    Whether Defendants owed a duty to Plaintiffs and members of the Subclasses;

b.    Whether Defendants knew or should have known that their manufacture of AFFF containing Toxic Surfactants was unreasonably dangerous;

c.    Whether Defendants knew or should have known that their AFFF contained persistent, non-biodegradable chemicals that were likely to contaminate drinking water supplies;

d.      Whether Defendants failed to warn users of the potential for harm that followed use of their products;

e.      Whether Defendants became aware of health and environmental harm caused by their AFFF products and failed to inform users of same; and

f.      Whether the members of the Subclasses have sustained damages and the proper measure of damages.

## Superiority

120.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.

121.    Defendants have acted on grounds generally applicable to the Subclasses, thereby making appropriate final legal and equitable relief with respect to the class as a whole.

122.    Furthermore, as the damages suffered by individual Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Subclasses to individually redress the wrongs done to them.

123.    Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

124.    There will be no difficulty in the management of this action as a class action.

## Rule 23(b)(2) Injunctive Relief

125.    In addition to the above, Plaintiffs bring this class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Subclasses as a whole, such that final injunctive relief is appropriate with respect to each of the Subclasses as a whole.

126. Such injunctive relief includes, but is not limited to, an injunction to require the implementation and funding of a blood serum testing program for the Plaintiffs and the Subclasses to test for the presence of PFOS and/or PFOA in their blood serum; and the implementation and funding of a medical monitoring program for the Plaintiffs and the Subclasses sufficient to monitor the Plaintiffs' and Subclasses' health to ensure they are adequately protected from the deleterious effects of PFOS and PFOA on the human body.

### Rule 23(c)(4) Certification of Particular Issues

127. In the alternative to certification under Rule 23(b)(2) or 23(b)(3), Plaintiffs and the Subclasses seek to maintain a class action with respect to particular issues under Rule 23(c)(4).

128. The adjudication of each Defendant's liability (jointly and severally) involves issues and questions common to the entire class, such that certification pursuant to Rule 23(c)(4) is appropriate.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Medical Monitoring

129. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

130. As a result of the Defendants' negligence, the Plaintiffs and Subclasses have been subjected to exposure greater than normal background levels of PFOS and PFOA.

131. As a proximate result of their exposure, the Plaintiffs and the Subclasses have a significantly increased risk of contracting a serious latent disease.

132.    A monitoring procedure exists that makes the early detection of such latent diseases possible.

133.    The prescribed monitoring regime for the early detection of latent diseases caused by exposure to PFOS and PFOA is different from that normally recommended in the absence of the exposure.

134.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

135.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the Subclasses.

## SECOND CLAIM FOR RELIEF

### Negligence

136.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

137.    The Defendants had a duty to manufacture, market, and sell their AFFF in a manner that avoided harm to those who foreseeably would come into contact with it.

138.    Defendants knew or should have known that the manufacture of AFFF containing Toxic Surfactants was hazardous to human health and the environment.

139.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF using Toxic Surfactants because it was a near certainty that the chemicals would migrate off of the Bases and contaminate the ground water and drinking water supply.

140.    The Plaintiffs and the Subclasses were foreseeable victims of the harm caused by Defendants' AFFF.

141.    As a result of Defendants' breach of its legal duty, the drinking water in and around the Bases, including the municipal water supplies distributed by Warminster, Horsham, and Warrington, Pennsylvania, the water supply on the Bases, and the private wells in the Affected Area, is contaminated with unsafe levels of PFOS and PFOA.

142.    As a result of Defendants' negligent, reckless and/or intentional acts and omissions alleged herein, both the municipal drinking water supply and the drinking water from private wells in the Affected Area are contaminated with PFOS and PFOA.

143.    Defendants' negligent manufacture, sale, or distribution of AFFF caused and is causing unknowing Plaintiffs and Subclass members an increased risk of associated illnesses due to the presence of PFOS and PFOA in their drinking water.

144.    Contamination of Plaintiffs' and the Subclasses' drinking water has resulted in the diminution of the value of properties in and around the Affected Area.

145.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the Subclasses.

146.    As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and the Subclasses have suffered and continue to suffer damages, including medical monitoring damages; monetary damages associated with the investigation, treatment, remediation, and monitoring of their drinking water; increased costs to obtain drinking water; and property damages, including, without limitation, loss of value, annoyance, disturbance, intrusion, harassment and inconvenience; all for which Plaintiffs and the Subclasses are entitled to recover damages.

Case 2:16-cv-04961-PBT   Document 1   Filed 09/15/16   Page 23 of 30

# THIRD CLAIM FOR RELIEF

## Defective Product - Failure to Warn

147.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

148.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, or otherwise distributing AFFF.

149.    As manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to provide reasonable instructions and warnings about the risks of injury posed by their products.

150.    Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF that they manufactured, sold, and distributed had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health and the environment.

151.    These risks were not obvious to users of the AFFF.

152.    Upon information and belief, the Defendants failed to provide warnings to the users that use of Defendants' AFFF could result in the contamination of groundwater and drinking water supplies.

153.    Upon information and belief, the Defendants failed to provide warnings to the users of the dangers to human health and the environment if their AFFF was permitted to contaminate the groundwater or drinking water supply.

154.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the AFFF.

155.   Had Defendants provided adequate warnings, the users of their AFFF would have taken adequate measures to store, use, and dispose of AFFF so as to reduce or eliminate groundwater and drinking water contamination from AFFF.

156.   As a result of Defendants' failure to warn against the likelihood of contamination from their AFFF, the groundwater and drinking water became contaminated with PFOS and PFOA.

157.   As a direct and proximate result of Defendants' failure to warn of the environmental and health impacts caused by their AFFF, the drinking water supplies in and around the area became contaminated with PFOS and PFOA and have caused health risks to Plaintiffs and the Subclasses.

158.   Defendants' failure to provide adequate warnings or instructions renders Defendants' AFFF a defective product.

159.   As a direct and proximate result of Defendants' manufacture, sale, or distribution of a defective product, Plaintiffs and the Subclasses have suffered and continue to suffer damages, including medical monitoring damages; monetary damages associated with the investigation, treatment, remediation, and monitoring of their drinking water; increased costs of drinking water; and property damages, including, without limitation, loss of value, annoyance, disturbance, intrusion, harassment and inconvenience; all for which Plaintiffs and the Subclasses are entitled to recover damages.

160.   As a result of Defendants' manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to the Plaintiffs and the Subclasses.

161.   Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the Subclasses.

## FOURTH CLAIM FOR RELIEF

### Defective Product - Design Defect

162.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

163.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, or otherwise distributing AFFF.

164.    It was foreseeable that toxic chemicals from the AFFF that Defendants manufactured, sold and distributed would enter the water supply of the Plaintiffs and the Subclasses and cause harm to their persons and property.

165.    Alternative designs of AFFF were available, technologically feasible and practical, and would have reduced or prevented the harm to Plaintiffs and the Subclasses.

166.    A reasonable alternative design would, at a reasonable cost, have reduced or eliminated the foreseeable risks of harm posed by AFFF.

167.    The AFFF manufactured, sold, or distributed by the Defendants was defective in design because the foreseeable risk of harm posed by the AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design.

168.    Defendants' products were defective at the time of manufacture, thusly, at the time they left Defendants' control.

169.    As a result of Defendants' manufacture, sale or distribution of a defectively designed product, the drinking water supplies in and around the Bases became contaminated with dangerous and toxic chemicals and damaged the Plaintiffs and the Subclasses.

170.    As a direct and proximate result of Defendants' manufacture, sale and distribution of a defective product, Plaintiffs and the Subclasses have suffered and continue to suffer

damages, including medical monitoring damages; monetary damages associated with the investigation, treatment, remediation, and monitoring of their drinking water; increased costs of drinking water; and property damages, including, without limitation, loss of value, annoyance, disturbance, intrusion, harassment and inconvenience; all for which Plaintiffs and the Subclasses are entitled to recover damages.

171.    As a result of Defendants' manufacture, sale and distribution of a defective product, Defendants are strictly liable in damages to the Plaintiffs and the Subclasses.

172.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the Subclasses.

## DAMAGES SOUGHT BY THE CLASS

173.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

174.    Plaintiffs and the Subclasses seek damages sufficient to fund a medical monitoring program that is reasonably tailored to the exposure risks posed by PFOS and PFOA described above.

175.    Plaintiffs also seek damages sufficient to fund a blood test program to pay for the costs of an initial blood test, and such follow-up blood tests that are deemed necessary, to determine the current levels of PFOS and PFOA in the blood serum of the Plaintiffs and the Subclasses.

176.    Plaintiffs and the Subclasses seek monetary damages for each violation of the First through Fourth Claims for Relief.  In particular, Plaintiffs and the Subclasses seek monetary damages:

(i) sufficient to remediate class members' property from the contamination caused by Defendants' conduct or, in the alternative, to compensate class members for the diminution in value of their property caused by Defendants' conduct;

(ii) to compensate class members for the loss of use and enjoyment of their properties caused by Defendants' conduct;

(iii) for the Private Well Subclass, for the increased costs to obtain drinking water, including the costs of alternative drinking water sources or the installation and maintenance of an adequate filtration system;

(iv) for the Municipal Water Subclass, for the increased costs of water that they will bear as rate-payers as a result of Defendants' conduct; and

(v) for such other monetary damages as are required to fully compensate Plaintiffs and the Subclasses for the loss of value of their properties caused by Defendants' conduct.

177.     Plaintiffs and the Subclasses seek punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future.

178.     In addition to the above, Plaintiffs and the Subclasses seek injunctive relief including, but not limited to, implementation of a mandatory testing protocol requiring Defendants to expeditiously test the wells of all Private Well Subclass members for the presence of PFOS and PFOA and to continue that testing until it is determined that the risk of PFOS and PFOA contamination in private wells has ended; to install permanent filtration devices on any private well testing positive for the presence of PFOS and/or PFOA, and to maintain those filtration devices pursuant to industry best practices; to establish and fund a blood testing program for Plaintiffs and members of the Subclasses; to establish and fund a medical monitoring program for Plaintiffs and members of the Subclasses; and to take all steps necessary

to remediate the Affected Area such that all municipal and private water supplies of the Municipal Water and Private Well Plaintiffs and Subclasses are free from the presence of PFOS and PFOA.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

A.      An order certifying the proposed Municipal Water Subclass, the Private Well Subclass, the Non-Property Owner Subclass, and the Base Water Subclass, and designating Plaintiffs as the named representatives of the respective Subclasses, and designating the undersigned as Class Counsel;

B.      An order requiring Defendants (i) to implement a testing protocol to test the wells belonging to each member of the Private Well Subclass; (ii) to install permanent filtration devices on any private well testing positive for the presence of PFOS and PFOA, or to facilitate the transition for Private Well Subclass to connect to a municipal water supply; (iii) to establish a blood testing program for Plaintiffs and the Subclasses; (iv) to establish a medical monitoring protocol for Plaintiffs and the Subclasses to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to PFOS and PFOA; and (v) to take all necessary steps to remediate the property and/or residences of Plaintiffs and the Subclasses to eliminate the presence of PFOS and PFOA;

C.      An award to Plaintiffs and Subclass members of compensatory, exemplary, and consequential damages, including interest, in an amount to be proven at trial;

D.      An award of attorneys' fees and costs;

E.      An award of pre-judgment and post-judgment interest, as provided by law; and

F.      Such other and further relief as the Court deems just and proper.


Dated:  September 15, 2016

John M. Broaddus (PA Bar No. 77892)
WEITZ & LUXENBERG
*A New York Professional Corporation*
200 Lake Drive East, Suite 205
Woodland Falls Corporate Park
Cherry Hill, NJ 08002
856-755-1115
856-755-1995
*jbroaddus@weitzlux.com*


Robin L. Greenwald (*Pro hac vice* anticipated)
Donald A. Soutar (Admission anticipated)
WEITZ & LUXENBERG
*A New York Professional Corporation*
700 Broadway
New York, NY 10003
Tel #: (212)558-5500
Fax #: (212)344-5461

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.


Dated:  September 15, 2016

_____
John M. Broaddus (PA Bar No. 77892)
WEITZ & LUXENBERG
*A New York Professional Corporation*
200 Lake Drive East, Suite 205
Woodland Falls Corporate Park
Cherry Hill, NJ 08002
856-755-1115
856-755-1995
*jbroaddus@weitzlux.com*


Robin L. Greenwald (P*ro hac vice* anticipated)
Donald A. Soutar (Admission anticipated)
WEITZ & LUXENBERG
*A New York Professional Corporation*
700 Broadway
New York, NY 10003
Tel #: (212)558-5500
Fax #: (212)344-5461